22-1464-cr
*United States v. Spencer*

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

### SUMMARY ORDER

*Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.*

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th day of August, two thousand twenty-three.

PRESENT:
> DENNY CHIN,
> STEVEN J. MENASHI,
> > *Circuit Judges*,
> ERIC R. KOMITEE,
> > *District Judge.*∗

_____

UNITED STATES OF AMERICA,

> *Appellee*,

> v.                                                                22-1464-cr

ERIC SPENCER, AKA Sealed Defendant 1,

> *Defendant-Appellant*.

_____

_____

∗Judge Eric R. Komitee of the United States District Court for the Eastern District of New York, sitting by designation.

1

*For Appellee:*                          LAUREN RIDDELL (Anirudh Bansal, *on the brief*), Cahill Gordon & Reindel LLP, New York, NY.

*For Defendant-Appellant*:               JANE Y. CHONG, Assistant United States Attorney (Matthew R. Shahabian and Hagan Scotten, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY.

Appeal from a judgment of the United States District Court for the Southern District of New York (Woods, J.).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

On February 2, 2021, Eric Spencer and his co-conspirators robbed a Chanel store in the SoHo neighborhood of Manhattan, stealing over $200,000 worth of merchandise. On February 20, 2021, Spencer was arrested in Florida and, one month later, was charged in a two-count indictment. Count One charged Spencer with conspiring to commit Hobbs Act robbery in violation of 18 U.S.C § 1951. Count Two charged Spencer with Hobbs Act robbery in violation of 18 U.S.C. §§ 1951 and 1952. The trial lasted from March 22 to 28, 2021, culminating in a conviction on both counts. On June 30, 2022, Spencer was sentenced by the district court to 87 months of imprisonment, followed by three years of supervised release, and restitution in the amount of $204,500. Spencer filed a timely notice of appeal on July 7, 2022, challenging the admission of two pieces of evidence. We assume the parties' familiarity with the underlying facts and procedural history.

Just before 2:00 PM on February 2, 2021, Spencer and his co-conspirators entered Chanel's SoHo location and began grabbing handbags and other merchandise. Four witnesses testified about the robbery: three Chanel security

guards—Vivian Harvey, Denzel Washington, and Suzy Murphy—and one Chanel employee—Julius Laroya. In addition to this testimony—as well as surveillance video, cellphone location analysis, social media activity, and internet search history—two out-of-court recorded statements were also admitted into evidence: (1) portions of video from the body camera of one of the police officers who interviewed Harvey immediately after the robbery and (2) the 911 call in which Washington reported the robbery. These two statements form the basis of Spencer's appeal.

We review the admission of evidence for abuse of discretion. *See United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision ... cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (footnote omitted). We conclude that the district court did not abuse its discretion and affirm the judgment.

**I**

In the body camera footage, Harvey tells the responding officer that when she reached for her weapon, the robber said, "Oh you wanna shoot me?," and then "he pulled his." Gov't Exhibit 117-A. Harvey clarifies to the officer that she never saw the gun, other than a "little bit" of a "brown" or "black" handle in the man's waistband. *Id*. In the video, Harvey can be seen waving her hands, touching her temples, and raising her voice when discussing the robbery. *Id*.

At trial, over a year later, the government played the admitted portion of the video. Harvey testified that she was "not sure" whether she in fact saw a gun handle. J. App'x 127. Harvey also admitted that she reported certain details incorrectly when speaking to the responding officer. For example, she stated that the man in the green sweatpants was wearing a black top instead of a grey top. *Id*. at 127-28. She explained that she was a "little shooken up" when interviewed immediately after the robbery. *Id*. at 128.

3

In admitting the video, the district court determined that the statements made by Harvey in the body camera footage were admissible as excited utterances. The district court noted that Harvey's statements were made "within minutes of the armed robbery" (six minutes to be exact), Sp. App. 79, and that, based on a review of the footage, the district court "interpret[ed] her body language and expressions to show her being under the stress of the incident," *id.* at 80. The district court concluded that the near-contemporaneous video of Harvey's reaction to the robbery provided "powerful direct evidence of those substantive legal elements of the charge," *id.* at 82, namely whether the defendant intended to put the victims in fear for their personal safety. The district court further determined that Harvey's statements were "intrinsically reliable" by nature of having been captured on video. *Id.* at 80.

Spencer contends on appeal that "the body camera footage permitted the Government to offer evidence that [Spencer] did have a gun, which clearly must have colored the jury's view of the Appellant, and suggested he was dangerous in a way the admissible evidence did not." Appellant's Br. 17. In challenging the admission of the body camera footage, Spencer argues (1) that the footage was insufficiently contemporaneous with the robbery, and (2) that Harvey's statements lacked sufficient reliability. *See id.* at 16. We disagree.

First, we agree with the district court on the issue of contemporaneity. "The rationale [of the excited utterance exception] … is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." *United States v. Tocco*, 135 F.3d 116, 127 (2d Cir. 1998). "[W]hile the hearsay exception for present sense impressions focuses on *contemporaneity* as the guarantor of reliability, and requires that the hearsay statement 'describe or explain' the contemporaneous event or condition, the excited utterance exception is based on the *psychological impact* of the event itself, and permits admission of a broader range of hearsay statements—*i.e.* those that 'relate to' the event." *Jones*, 299 F.3d at 112 n.3 (citation omitted). Therefore, unlike a present sense impression, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." *Tocco*, 135 F.3d at 127

4

(affirming the admission of an excited utterance that occurred three hours after startling information was shared); *see also United States v. Scarpa*, 913 F.2d 993, 1017 (2d. Cir. 1990) (affirming the admission of an excited utterance that occurred five or six hours after the startling event). We do not believe that the brief six-minute gap between the robbery and the interview prevented Harvey's statements from qualifying as excited utterances. Indeed, Harvey's body language in the video demonstrates that she remained under the stress of the event. *See Tocco*, 135 F.3d at 128 (observing that the declarant's "excitement obviously had not subsided").

Second, we reject the contention that Harvey's confusion over whether Spencer possessed a gun means that she engaged in "unreliable speculation." Appellant's Br. 17. Spencer implies that Harvey lacked sufficient personal knowledge of the circumstances of the robbery. *See* Fed. R. Evid. 602. Yet this is not a case in which the declarant did not witness the event.[1] Here, there is no question that Harvey saw the event because she was present for it, and the government correctly asserts that her inability to discern whether the robber actually had a gun—or was only pretending to have one—does not render her utterances unreliably speculative. Any inconsistencies between Harvey's testimony and her excited utterances in the video were, as the district court stated, "fair fodder on cross examination or closing argument but are no reason to exclude the evidence in its entirety." Sp. App'x 80-81.

## II

Next, Spencer argues on appeal that Washington lacked the requisite personal knowledge for his statements from the 911 call to be admitted. According to Spencer, "[t]he 911 call itself and [Washington's] trial testimony make clear that his hearsay statements about the presence of a gun were not based on his own

---

[1] *See, e.g.*, *United States v. Gonzalez*, 764 F.3d 159, 169 (2d Cir. 2014) (concluding the district court did not abuse its discretion in determining out-of-court statements by a child regarding a shooting to be inadmissible as either present sense impressions or excited utterances because the child was asleep in another room when the shooting occurred); *Browne v. Keane*, 355 F.3d 82, 88-89 (2d Cir. 2004) (concluding that a 911 caller's description of two shooters could not be admitted as a present sense impression because the caller may not have actually seen the shooting).

observations—as is essential for their admission under either exception—but rather on information relayed from others." Appellant's Br. 18.

During the 911 call, a person can be heard in the background saying several times, "he had a gun," J. App'x 124, to which Washington responded, "he had it," *id.* at 49. Once Washington spoke to the operator, the operator stated that he had heard "someone in the back saying that they saw a gun?" Gov. Exhibit 601-R. Washington confirmed that "yes, one of the men were armed … Three males." *Id.* Washington then clarified that "[o]ne male had a gun, but it was four suspects" and "[w]e all just backed up and let them." *Id.*

The district court reserved ruling on the admissibility of the call because it was not clear whether Washington's statements were based on his personal perception or relayed what other witnesses saw. *See* Sp. App'x 71-72. The district court, in rejecting a pretrial motion by the government for reconsideration on this question, reasoned that a foundation for admissibility could not be established until Washington testified.

At trial, Washington testified that he saw Harvey show the robber in green pants her holstered firearm, after which the robber "gestured his hands inside of his waistband and said, what the fuck are you going to do, shoot me?" *Id.* at 171. Washington stated that "once he did that, I was kind of sure he had something and he wasn't afraid to use it." *Id.* at 172. Washington clarified that the "something" was a "weapon." *Id.* He explained that he believed the robber had a weapon "[b]ecause of the gesture that he made, and, in my experience, you don't walk up to someone that has a firearm unless you have something, you know, to defend yourself." *Id.* at 172-73. Washington acknowledged that he did not actually see a gun, though he did see the robber "reach[] inside his waistband and actually tuck[] his hand in." *Id.* at 173. Washington reasoned, "So it's like, okay, he has something, and he will basically probably pull it out and use it." *Id.* Like Harvey, Washington also testified that he misreported a detail on the 911 call, stating that the robber was wearing a green "hoodie" instead of green sweatpants. J. App'x 50-51. Washington explained that he made the error because at the time of the call he

was "still pretty shaken up" and "still pretty distraught, still pretty scared." *Id.* at 50-51.

We agree with the district court's determination that Washington's testimony provided an adequate foundation for admitting the 911 call excerpts as both present sense impressions and excited utterances. As the district court noted, "[t]he witness has testified that he did not see the gun, but, based on the observations of the motions of the person, he was, as he said, 100 percent sure that the man was armed." Sp. App'x 197. In later testimony, after the jury heard the 911 call, Washington testified that he had thought the robber was armed because of Harvey's statements and "[b]ecause of the actions and the body language of the individual." J. App'x 49. Because Washington, like Harvey, reacted to what he witnessed as the robbery unfolded, we cannot conclude that Harvey lacked the requisite personal knowledge.

## III

Even if the district court had erroneously admitted these two pieces of evidence, we would still need to "evaluate the erroneous admission of hearsay evidence for harmless error." *United States v. Dukagjini*, 326 F.3d 45, 59-60 (2d Cir. 2003). According to Spencer, the error of admitting both pieces of evidence was not harmless because it "prevented the jury from fairly judging the case based on the admissible evidence," thereby "depriving the Appellant of a fair trial." Appellant's Br. 17. By "suggesting that the Appellant possessed a gun during the offense," this evidence "clearly prejudiced his defense, particularly since the testimony and other admissible trial evidence did nothing to establish that a gun was present during the offense." *Id.* at 19-20. We disagree and conclude that any possible error would be harmless.

"Error is harmless if it is highly probable that it did not contribute to the verdict." *United States v. Gomez*, 617 F.3d 88, 95 (2d Cir. 2010) (quoting *United States v. Kaiser*, 609 F.3d 556, 573 (2d Cir. 2010)). In reviewing for harmless error, we consider "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of

7

the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *United States v. Kaplan*, 490 F.3d 110, 123 (2d Cir. 2007). This court has "repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009).

Here, the government's case against Spencer was strong. Spencer bragged about possessing numerous Chanel bags on his Facebook account, writing "So much double C RN [right now]. I could open a small boutique FRFR [for real, for real]." J. App'x 672. "Double C" is slang for the interlocking C-logo for the brand Chanel. *Id.* at 513. Photos of four of the stolen bags were found on Spencer's phone with metadata indicating that the pictures had been taken either the day of or the day after the robbery. *Id.* at 502-05. Spencer's private Facebook messages show him discussing the sale of the bags. Spencer wrote, for example, "They [$]5,000. I was selling them for [$]2,000," *id.* at 394, and "I had Chanel bags. They all gone thou," *id.* at 393. These messages were also found on Spencer's cellphone. Additionally, video surveillance from an apartment complex in Brooklyn showed Spencer and one of the other robbers shortly before the robbery dressed in the same clothing they wore during the robbery. *Id.* at 353-66. Surveillance footage also shows a black Audi arriving to pick up Spencer and his co-conspirator before the robbery in Brooklyn, *id.* at 367-69, with a similar car appearing in surveillance video from around the Chanel store at the time of the robbery, *id.* at 196-201. Testimony from a cellphone location analyst identified Spencer's phone as being in the vicinity of the Brooklyn apartment complex both before and after the robbery. *Id.* at 272-78.

Furthermore, we agree with the government that the recorded statements regarding the presence of a weapon were largely cumulative of testimony provided by three of the four witnesses, who believed that the robber in the green sweatpants was armed. Such testimony makes the additional recorded statements "less likely to have injuriously influenced the jury's verdict." *Wray v. Johnson*, 202 F.3d 515, 526 (2000).

8

Spencer's conviction on Count Two did not depend on whether he had a gun but on whether he threatened force. *See* 18 U.S.C. § 1951(b)(1). The district court instructed the jury that the government needed to prove only that Spencer "threatened force, violence or fear of injury," that such a threat of force or violence "may be made verbally or by physical gesture," and that fear of injury means that a victim reasonably feared or expected personal harm. J. App'x 825-26. Therefore, the government argued to the jury that Spencer sought to make the victims believe he had a gun, not that he actually had one. *Id.* at 782. The government stated in summation that "it doesn't matter if [Spencer] had a gun .… What matters is, … when he was in the store, he wanted his victims to think he had a gun. What matters is that he wanted to scare them into submission. What matters is that he succeeded into [their] not putting up a fight." *Id.* Accordingly, "the prosecutor's conduct" with respect to the evidence does not suggest prejudice. *Gomez*, 617 F.3d at 95.

*        *        *

We have considered Spencer's remaining arguments, which we conclude are without merit. We affirm the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

9