**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-4751**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ZAVIAN MUNIZE JORDAN,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina at Charlotte.  Robert J. Conrad, Jr., District Judge.  (3:16-cr-00145-RJC-2)

Argued:  October 29, 2019                          Decided:  March 3, 2020

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion.  Judge Harris wrote the opinion, in which Judge Richardson and Judge Quattlebaum joined.

**ARGUED:** Leigh Schrope, LAW FIRM OF SHEIN & BRANDENBURG, Decatur, Georgia, for Appellant.  Anthony Joseph Enright, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.  **ON BRIEF:** Marcia G. Shein, LAW FIRM OF SHEIN & BRANDENBURG, Decatur, Georgia, for Appellant.  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

PAMELA HARRIS, Circuit Judge:

A jury convicted appellant Zavian Munize Jordan of two violations of 18 U.S.C. § 924(c), for possession of a firearm in furtherance of a drug-trafficking crime, and four other drug-trafficking and firearms-related offenses. The district court sentenced Jordan to a total of 420 months in prison, including a five-year mandatory consecutive sentence for his first § 924(c) conviction and a 25-year mandatory consecutive sentence for the second.

Jordan challenges both his conviction and his sentence, raising four principal arguments on appeal: (1) that under the Fourth Amendment, the district court erred in failing to suppress evidence gathered from the traffic stop that led to his arrest and subsequent incriminating statements; (2) that under the Sixth Amendment's Confrontation Clause, the district court erred in admitting evidence relating to a recorded phone call between Jordan and an informant who did not testify at trial; (3) that the district court erred in failing to merge his two § 924(c) firearms convictions for sentencing purposes; and (4) that § 403 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5221–22 which was enacted while this appeal was pending, should apply to his case, where it would have the effect of substantially lowering the mandatory minimum sentence for his second § 924(c) conviction.[1]

---

[1] Jordan also raises an ineffective assistance of counsel claim, contending that his trial counsel performed deficiently by failing to challenge certain search warrants. "[I]t is well settled that a claim of ineffective assistance should be raised in a 28 U.S.C. § 2255 motion in the district court rather than on direct appeal, unless the record conclusively shows ineffective assistance." *United States v. King*, 119 F.3d 290, 295 (4th Cir. 1997)

Finding no error in the district court's rulings and holding that § 403 of the First Step Act does not apply retroactively to cases pending on direct appeal when it was enacted, we affirm both Jordan's conviction and his sentence.

# I.

## A.

Zavian Munize Jordan was the subject of a weeks-long investigation by the federal Drug Enforcement Administration ("DEA"). Jordan came to the attention of federal agents when another individual, Ricky Grant, was arrested for drug distribution and identified Jordan as his primary and long-standing source of heroin. Agency Task Force Officer Clint Bridges then instructed Grant to phone his heroin supplier, while officers monitored and recorded the call. Though Grant and Jordan did not refer to drugs by name during their conversation, the officers understood them to be using a kind of code describing a drug transaction. *See* S.J.A. 002 (Grant informing Jordan that he is "looking slim" and asking when they would "get back right"; Grant suggesting he might "holler" at someone else and Jordan telling him to "hold up" before he did that); *see also* J.A. 161–62 (officer testimony at trial describing the way in which drug traffickers routinely use code words when speaking on the phone). Based on Grant's statement and the contents of the call, the

---

(internal quotation marks omitted). Because there is no conclusive evidence of ineffective assistance on the face of this record, Jordan's claim should be raised, if at all, in a § 2255 motion. *See United States v. Faulls*, 821 F.3d 502, 508 (4th Cir. 2016).

3

officers obtained a warrant to track the location of Jordan's phone, and later, a second warrant to place a location-tracking device on Jordan's truck.

The investigation came to a head on May 11, 2016, when federal agents who had Jordan under surveillance watched him enter and depart several locations over a short period of time, sometimes entering with one package and leaving with another. At that point, DEA Special Agent James Billings decided to conduct an investigatory stop of Jordan. He reached out to Detective Christopher Newman of the Charlotte-Mecklenburg Police Department, who had been assisting the DEA in its operation, and asked him to conduct a routine traffic stop. As Agent Billings explained to the district court, the DEA frequently asks local officers to find cause to pull over drug suspects for traffic violations: A suspect who believes he is the subject of a routine traffic stop is less likely to resist and create a danger to the public; and if the stop does not uncover evidence of criminal activity, the investigation can continue without the suspect having been alerted to it.

Detective Newman followed Jordan until he saw him turn through a red light without stopping, and then pulled him over. When he approached Jordan's truck, Newman found Jordan on the phone and unwilling to engage with him, and saw several other cellphones in the vehicle. Newman asked Jordan to step out of the truck and patted him down, observing a rubber glove – which he knew to be common packaging for drugs – in Jordan's pants pocket. By then, Jordan's brother had arrived on the scene in a separate vehicle, attempting to "interject himself" into the stop. J.A. 132. Newman accordingly waited for about 11 minutes for back-up before walking his drug-detecting dog around the truck. The dog alerted, and Jordan admitted that he had cocaine in his possession.

4

Detective Newman then found approximately 12 grams of cocaine in the rubber glove from Jordan's pocket, along with roughly $2,000 in cash, also in Jordan's pocket. After a search of the truck revealed six phones, $26,000 in cash, and a handgun, Jordan was arrested.

Jordan was advised of his rights and agreed to talk to the police, admitting that he was involved in cocaine trafficking and giving a detailed statement. After obtaining warrants, police officers conducted several searches. At the home of Jordan's deceased grandmother, which Jordan had identified as the place he used to prepare and package drugs, they recovered 275 grams of heroin, digital scales and drug-packaging materials, and a gun and ammunition. At one of the residences Jordan had visited on the day he was stopped, at which Jordan admitted he regularly sold drugs, the police recovered about 750 grams of cocaine, marijuana, and another firearm. And at the residence Jordan shared with his girlfriend, the police found $24,000 in cash and more firearms.

**B.**

Jordan was indicted on six counts of drug- and firearm-related offenses. Count One charged Jordan and others with conspiring to distribute heroin and cocaine. Counts Five and Six – the next counts involving Jordan – charged him with substantive drug offenses: possession with intent to distribute heroin and cocaine, and distribution of cocaine. Counts Eight and Nine each charged Jordan with possessing a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A); Count Eight referred to the drug-trafficking conspiracy set out in Count One, and Count Nine, to the drug-trafficking offense in Count Six. Finally, Count Ten charged Jordan with possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

5

Before trial, Jordan moved to exclude the evidence seized from the traffic stop and his subsequent incriminatory statements, on the ground that Detective Newman violated the Fourth Amendment by unduly prolonging his traffic stop without the requisite reasonable suspicion. The district court denied the motion. Jordan also moved unsuccessfully to exclude from trial his recorded phone call with Ricky Grant, arguing that because Grant would not be testifying at trial, his statements were inadmissible hearsay and their introduction would violate the Sixth Amendment's Confrontation Clause.

After a three-day trial, the jury found Jordan guilty of all charges against him. Before sentencing, Jordan moved to merge Counts Eight and Nine – the two § 924(c) firearm charges – or to vacate one for sentencing purposes, because "[n]othing in the jury verdict indicates that it found that [he] possessed *different* guns at *different* times." J.A. 465 (emphases added). The district court denied the motion, explaining that Jordan's claim was foreclosed by *United States v. Khan*, 461 F.3d 477, 494 (4th Cir. 2006), in which this court held that a single use or possession of a firearm may be the basis for multiple consecutive § 924(c) sentences.

The district court sentenced Jordan to a total of 420 months, or 35 years, in prison: five years on the drug-conspiracy count, each of the drug-trafficking counts, and the felon-in-possession count (Counts One, Five, Six, and Ten), all to run concurrently; plus the mandatory five-year consecutive term on the first § 924(c) firearm offense (Count Eight) and the mandatory 25-year consecutive term on the second § 924(c) offense (Count Nine).

Jordan filed this timely appeal. While his appeal was pending and after briefs were filed, on December 21, 2018, Congress enacted the First Step Act. Pub. L. No. 115-391,

6

132 Stat. 5194. Section 403 of the First Step Act amended 18 U.S.C. § 924(c)(1)(C) in a way that is relevant to Jordan's sentence: Under the new § 403, if an individual is convicted of two § 924(c) offenses in the same proceeding, as Jordan was here, the mandatory minimum sentence for the second offense drops from 300 months to 60 months. § 403(a), 132 Stat. at 5221–22. Section 403 expressly addresses its "applicability to pending cases," providing that the new penalties apply to offenses committed before its enactment "if a sentence for the offense has not been imposed" as of the date of enactment. § 403(b), 132 Stat. at 5222. In a letter to this court, Jordan argued that under the First Step Act, he no longer was eligible for the mandatory 300-month sentence he is serving on his second § 924(c) conviction. The government disagreed, and both parties filed supplemental briefs on the issue.

## II.

Jordan raises four arguments on appeal, two concerning his conviction and two concerning his sentence. We take those arguments in turn, providing additional factual context as necessary.

## A.

Jordan first challenges his conviction on the ground that the district court erred in denying his motion to suppress evidence seized from the traffic stop and the incriminatory statements that followed. Jordan does not dispute the validity of Detective Newman's initial stop of his truck for a traffic violation, regardless of the officer's actual motives. *See United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) ("In assessing the legitimacy

of a traffic stop, we do not attempt to discern an officer's subjective intent for stopping the vehicle."). But, Jordan argues, Newman violated the Fourth Amendment when he prolonged that stop for 11 minutes, beyond the time required to complete a traffic stop, without reasonable suspicion of some other offense.

In an oral ruling, the district court rejected that claim. At the time Newman initiated his traffic stop of Jordan, the court concluded, there already was "overwhelming" indicia of reasonable suspicion that Jordan was engaged in drug trafficking: the cooperating witness, Ricky Grant; the preliminary cell phone and GPS tracking devices, based on a magistrate's probable cause determination; and the suspicious activity – the quick stops at various locations, entering and leaving with different packages – on the day of the stop. By itself, the district court held, that was sufficient to justify the length of the detention at issue: Given the safety concerns generated by "this drug trafficking investigation in which guns and large sums of drugs and money had recently been seized from a co-conspirator," Newman was justified in waiting for back-up before proceeding, and "that length of time was a reasonable period" for the stop. J.A. 778. The activity observed during the stop, the court finished – multiple cell phones, the rubber glove that Newman believed to be contraband – "only furthered" the reasonable suspicion with which Newman started. *Id.* at 779.

We agree with the district court. In considering the denial of Jordan's suppression motion, we review the district court's factual findings for clear error, taking the evidence in the light most favorable to the government, and its legal conclusions de novo. *United States v. McBride*, 676 F.3d 385, 391 (4th Cir. 2012). Like the district court, we think that

8

Detective Newman came to his encounter with Jordan with ample reasonable suspicion of drug distribution, justifying the full length of the stop under the Fourth Amendment.

It is true, as Jordan emphasizes, that when a stop is based solely on probable cause of a traffic violation, it may not be prolonged beyond the time reasonably required to "complete the mission" of a traffic stop – inspecting license and registration, issuing a ticket, and so forth. *United States v. Bowman*, 884 F.3d 200, 209–10 (4th Cir. 2018) (alteration omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)); *see also Rodriguez v. United States*, 575 U.S. 348, 354 (2015). After that time, the stop will become unlawful, unless during the stop the officers obtain consent or develop reasonable suspicion of some ongoing criminal activity. *Bowman*, 884 F.3d at 210.

But this is not that kind of case because, as the district court recognized, Detective Newman *already* had reasonable suspicion of ongoing criminal activity, apart from Jordan's traffic violation, when he stopped Jordan's truck. Under the constructive or collective knowledge doctrine, we impute to Detective Newman knowledge of all the facts known to Agent Billings when he asked Newman to make a traffic stop of Jordan. *See United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) (under the collective knowledge doctrine, we "substitute the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*"). And, indeed, Newman in fact was aware – because he had been told by federal agents – that Jordan was suspected of drug trafficking, and that others involved in the same scheme had been found with firearms or had histories of violent crimes. He also had constructive knowledge, as the district court described, of Ricky Grant's identification of Jordan as his primary supplier; of the warrants issued, based on

9

probable cause, for the tracking of Jordan's cell phone and truck; and of Jordan's movements earlier in the day, which Agent Billings observed and believed, based on his knowledge and experience, were indicative of drug transactions.

We think that is enough for reasonable suspicion, which is "simply . . . a particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (internal quotation marks omitted). Jordan insists that his earlier behavior on the day in question, observed by the agents, is as consistent with running errands and visiting friends as it is with drug transactions. But Agent Billings, based on his knowledge and experience, saw it differently, and in any event, those observations must be considered together with the totality of the circumstances, including the credible identification of Jordan as Grant's regular drug supplier. Considering the facts as a whole, and "mindful of the practical experience of officers who observe on a daily basis what transpires on the street," Agent Billings and thus Detective Newman had a "particularized and objective basis," for suspecting Jordan of drug trafficking when Detective Newman initiated the stop. *See Bowman*, 884 F.3d at 213 (internal quotation marks omitted).

We also agree with the district court that this initial reasonable suspicion justified the length of the stop in question, which was extended by roughly 11 minutes when Detective Newman waited for back-up before completing his investigation. "Investigating officers may take such steps as are reasonably necessary to maintain the status quo and protect their safety during an investigative stop." *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988). Detective Newman, who had reason to believe that Jordan was

10

working with armed drug dealers and was confronted not only with Jordan but also with his brother, did not unreasonably prolong Jordan's detention by waiting briefly for assistance on the scene.

The district court also determined, as noted above, that Detective Newman's observations during the stop "furthered" the reasonable suspicion showing, and the government relies on some of those observations in its argument for reasonable suspicion. Because we conclude that Newman had reasonable suspicion from the outset, however, we need not consider whether additional information uncovered during the stop may have contributed to that showing. Newman had the requisite reasonable suspicion that Jordan was engaged in illegal drug activity from the start, and that reasonable suspicion was sufficient to justify Jordan's stop under the Fourth Amendment.

**B.**

Jordan's second challenge to his conviction concerns the admission at trial of parts of the recorded phone call Ricky Grant made to him at police direction. The excerpts were introduced at trial with the testimony of Officer Bridges, who testified that he "instructed Mr. Grant to place a call to his supplier," J.A. 173, and described the way the call was monitored and recorded. The district court instructed the jury that it should not consider any of Grant's statements on the recording "for the truth of the matter that he's stating," but only to "provid[e] context" for Jordan's responses. J.A. 177. Over Jordan's objection, the jury then heard excerpts of the conversation, along with testimony from Bridges explaining that drug traffickers, when speaking on the phone, commonly use coded terms to avoid referring expressly to drugs.

11

1.

Before trial, Jordan had moved to exclude the recording. Jordan did not dispute the admissibility of his own statements on the call, instead arguing that Grant's statements were inadmissible: Because Grant would not be testifying at trial, his statements constituted hearsay, and their admission would violate Jordan's rights under the Sixth Amendment's Confrontation Clause. The district court denied Jordan's motion, ruling that so long as Grant's statements were "offered for the limited purpose of providing context for the responses of Mr. Jordan," they were not inadmissible hearsay and their introduction would not violate the Confrontation Clause. J.A. 96.

On appeal, Jordan renews his Confrontation Clause argument against the admission of Grant's side of the recorded call. While we typically review evidentiary decisions for abuse of discretion, we review those that implicate the Confrontation Clause de novo. *United States v. Summers*, 666 F.3d 192, 197 (4th Cir. 2011). We agree with the district court, finding no error in admitting the recorded phone call.

The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ." This constitutional right to confrontation bars the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). The Clause does not, however, "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9. And so we have made clear – along with several other circuits – that recorded

12

statements of non-testifying informants like Grant may be used at trial consistent with the Confrontation Clause so long as they are offered only to provide context for the defendant's own statements, and not for the truth of the matter asserted. *See United States v. Wills*, 346 F.3d 476, 489–90 (4th Cir. 2003); *see also United States v. Barragan*, 871 F.3d 689, 705 (9th Cir. 2017) ("The informant's statements were not admitted for their truth, and the admission of such context evidence does not offend the Confrontation Clause." (internal quotation marks omitted)); *United States v. Occhiuto*, 784 F.3d 862, 866 n.2 (1st Cir. 2015) (same); *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006) (same). That is exactly what happened here. The district court admitted Grant's statements only to provide context for Jordan's own statements on the call, and clearly instructed the jury to that effect: "[Y]ou are not to consider the statements of Grant for any purpose other than providing context for the responses that you hear . . . ." J.A. 177. We find no error in the district court's ruling on Jordan's objection.

2.

Jordan now raises an additional Confrontation Clause argument for the first time on appeal. This one focuses not on the contents of the call, but on Officer Bridges' testimony that Grant phoned Jordan after he was instructed to "call . . . his supplier." J.A. 173. Though its precise contours are a bit unclear, Jordan's claim appears to be that when Grant placed a call to Jordan after being told to call his supplier, he engaged in "assertive conduct" – the equivalent of saying verbally "Jordan is my supplier" – that falls within the scope of the Confrontation Clause.

13

Because Jordan did not object at trial to Officer Bridges' testimony about the call, we review his new argument for plain error only. "To establish plain error, a defendant has the burden of showing: (1) that an error was made; (2) that the error was plain; and (3) that the error affected his substantial rights," and even then, we will exercise our discretion to correct only those errors that would result in a miscarriage of justice or otherwise undermine the "fairness, integrity[,] or public reputation of judicial proceedings." *United States v. Carthorne*, 726 F.3d 503, 510 (4th Cir. 2013) (internal quotation marks omitted). Here, we need focus only on the second requirement. Any error in admitting Officer Bridges' testimony – a matter we need not decide – was not so "clear or obvious" that it amounted to "plain error" for purposes of our review. *United States v. Marcus*, 560 U.S. 258, 262 (2010) (defining "plain error").

The Confrontation Clause applies only to "testimonial statements." *United States v. Washington*, 498 F.3d 225, 229 (4th Cir. 2007). The jury in Jordan's case never heard testimony that Grant *said* that Jordan was his supplier. But as Jordan explains, a "statement" also may take the form of nonverbal conduct intended as an assertion, often referred to as "assertive conduct." *Id.* at 230 & n.1 (discussing definition of "statement" in Federal Rule of Evidence 801(a) and applying same analysis to Confrontation Clause); *see, e.g.*, *United States v. Caro*, 569 F.2d 411, 416 n.9 (5th Cir. 1978) (treating "pointing" at location of drug source as "assertive conduct" that, "like an oral declaration, is subject to the hearsay rule"). According to Jordan, when Grant phoned him in response to a direction to call his supplier, he engaged in assertive conduct, effectively identifying Jordan as his source just as though he had said the words out loud. Because the jury could infer

14

from Officer Bridges' testimony a "statement" by Grant that was not subject to cross-examination at trial, Jordan finishes, his Confrontation Clause rights were violated.

This court has not addressed whether and under what circumstances compliance with law enforcement instructions might be deemed "assertive conduct," so that testimony about that compliance would be subject to Confrontation Clause limits. But the First Circuit has, and on facts virtually identical to those presented here, it held that when a confidential informant, at the direction of police officers, made a phone call to the intended recipient of intercepted drugs and then drove the officers to a rendezvous with the recipient, she engaged only in *non*-assertive conduct that did not qualify as a "statement" for evidentiary purposes. *See United States v. Bailey*, 270 F.3d 83, 87 (1st Cir. 2001). Testimony about that compliance, the court explained, "described conduct" rather than introducing statements: The confidential informant "did not orally identify [the defendant]," and "[t]he agent did not testify that [the confidential informant] pointed at [the defendant] or in any way made an out of court declaration regarding his identity." *Id.*

Jordan cites no cases to the contrary, and we have found none. Jordan relies primarily on the Second Circuit's decision in *United States v. Gomez*, 617 F.3d 88 (2nd Cir. 2010), and though that case, too, involves a police-directed phone call by a confidential informant to his supplier, there is an important distinction. In *Gomez*, a police officer testified at trial that he told an informant to call his supplier, and that he himself – the officer – then selected the defendant's phone number from the informant's phone and placed the call, before handing the phone back to the informant. *Id.* at 91. From that testimony, the court held, a jury could infer that the informant must have *told* the officer,

15

in so many words, the identity of his supplier, because otherwise the officer would not have been able to select the defendant's number from the informant's address book. *Id. Gomez*, in other words, involved an actual verbal statement, inferable from the officer's testimony. Here, by contrast, Officer Bridges neither said nor suggested that Grant verbally identified Jordan as his supplier. The only question, again, is whether Grant's act of calling Jordan qualified as a "statement" in the form of assertive conduct – a question to which *Gomez* does not speak, but *Bailey* does. Given *Bailey*'s rejection of Jordan's position, and the absence of case law adopting it, the district court did not commit plain error when it admitted Bridges' testimony about the call. *See Carthorne*, 726 F.3d at 516 (district court does not commit plain error by following reasoning of another circuit when we have "yet to speak directly on a legal issue").

## C.

With respect to his sentence, Jordan argues, first, that the district court erred in sentencing him separately for his two convictions, under Counts Eight and Nine, for possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c). According to Jordan, multiple and consecutive § 924(c) sentences are permissible only where each is supported by a distinct use of a firearm. And here, Jordan finishes, the jury's general verdict could have rested on a finding that Jordan used one gun on one occasion, in furtherance of both the conspiracy to distribute drugs that was the predicate for Count Eight and the substantive drug-distribution offense identified in Count Nine, making separate sentences unlawful.

16

The district court rejected that claim when Jordan raised it, after his guilty verdict but before sentencing, in a "Motion to Merge/Vacate Counts 8 and 9." J.A. 464. The district court acknowledged that other circuits have adopted the premise of Jordan's argument: that one use of a firearm, in the simultaneous commission of two predicate drug-trafficking offenses, will not support separate § 924(c) convictions and sentences. *See* J.A. 483 n.2. But the Fourth Circuit, the court continued, has squarely rejected that position, holding in *United States v. Khan*, 461 F.3d at 493–94, that the same criminal episode indeed may lead to multiple sentences under § 924(c), so long as they are based on separate predicate offenses that are not duplicative under a double jeopardy analysis. Here, the jury convicted Jordan of § 924(c) offenses based on separate and non-duplicative predicate offenses – conspiracy under Count Eight and possession with intent to distribute under Count Nine – and that was enough, under circuit case law, to sustain separate § 924(c) sentences. Finally, the district court noted that while Jordan's argument depended on the failure of the jury to specify the findings underlying its convictions on the § 924(c) charges, Jordan had not requested a jury instruction on the issue or a special verdict form.

We review this question of law de novo, *see United States v. Fareed*, 296 F.3d 243, 245 (4th Cir. 2002), and again, we agree with the district court. Under *Khan*, there is no requirement that multiple and consecutive § 924(c) sentences rest on the use of different firearms or distinct uses of the same firearm. Here, as the district court explained, Jordan's two § 924(c) convictions were predicated on different underlying offenses. And because those two offenses – conspiracy to possess with intent to distribute a controlled substance, and possession with the intent to distribute – are not duplicative for double jeopardy

17

purposes, *see United States v. Yearwood*, 518 F.3d 220, 223 (4th Cir. 2008) ("A substantive crime and conspiracy to commit that crime are separate offenses for purposes of the Double Jeopardy Clause . . . ." (internal quotation marks omitted)), they may support two § 924(c) convictions and sentences under *Khan*. Even assuming, in other words, that the jury convicted Jordan on the two § 924(c) counts because it found that one use of one gun furthered both predicate offenses, separate sentences would be permissible.

Jordan emphasizes that our decision in *Khan* conflicts with the rule adopted by several other circuits, prohibiting multiple § 924(c) sentences arising from a single use of a firearm. *See, e.g.*, *United States v. Rentz*, 777 F.3d 1105, 1115 (10th Cir. 2015) (en banc); *United States v. Cureton*, 739 F.3d 1032, 1043 (7th Cir. 2014); *United States v. Phipps*, 319 F.3d 177, 185 (5th Cir. 2003); *United States v. Finley*, 245 F.3d 199, 208 (2d Cir. 2001); *United States v. Wilson*, 160 F.3d 732, 749 (D.C. Cir. 1998). But as a panel of this circuit, we of course are bound by our own precedent, and may not reconsider *Khan* in this posture. *See McMellon v. United States*, 387 F.3d 329, 332–33 (4th Cir. 2004) (en banc). We note, moreover, that this is not the kind of case that has most troubled some courts, in which the evidence presented at trial makes clear that multiple § 924(c) convictions rest on a single use of a single gun. Here, as the district court explained, the jury was presented with ample evidence of different uses of different guns, all in furtherance of the predicate drug-trafficking offenses. *See* J.A. 484 (describing the handgun recovered from Jordan's grandmother's home, the two different handguns recovered from Jordan's residence, and yet another handgun found in Jordan's truck on the day he was arrested). And as the district court noted, had Jordan nonetheless been concerned that the jury might base its two

18

§ 924(c) convictions on a single use of a gun, he could have requested a jury instruction on the issue or a special verdict form that would have detailed the jury's reasoning, but did neither.

Accordingly, we find the district court did not err in denying Jordan's motion to sentence him on only one of his two § 924(c) convictions.[2]

## D.

Jordan's final argument also concerns his § 924(c) sentences. At the time Jordan was sentenced, it was clear that § 924(c)'s sentencing regime mandated a five-year mandatory minimum sentence for a first conviction and a 25-year consecutive mandatory minimum for a second, even when both convictions arose from a single proceeding, *see Deal v. United States*, 508 U.S. 129, 137 (1993), and Jordan was sentenced accordingly, to a five-year prison term on his first § 924(c) conviction and to 25 years on his second. But while Jordan's case was pending on appeal, Congress enacted the First Step Act, which

---

[2] In light of our disposition, we need not rule on the government's argument that Jordan's motion should have been construed as a motion to vacate a conviction under Federal Rule of Criminal Procedure 33, which would have meant both that it raised an unpreserved issue connected to his conviction and that it was untimely under Rule 33. We note, however, that the district court construed Jordan's filing as a sentencing motion, requesting merger of the two convictions for sentencing purposes, *see* J.A. 484 (concluding that Jordan "may be sentenced on each of Counts Eight and Nine"), consistent with our case law, *see, e.g.*, *United States v. Dire*, 680 F.3d 446, 476 (4th Cir. 2012) (recognizing challenge to a district court's failure to merge multiple § 924(c) convictions as a sentencing argument). And the government's failure to raise a timeliness objection before the district court ordinarily would preclude its consideration here. *See Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam) (where the government fails to raise a timeliness defense before a district court rules on a Rule 33 motion, the defense is forfeited).

19

amends § 924(c) so that the 25-year mandatory minimum for a second or subsequent offense applies only when a prior conviction under § 924(c) already "has become final." Pub. L. No. 115-391, § 403(a), 132 Stat. 5194, 5222. Under the First Step Act, in other words, the 25-year mandatory minimum is reserved for recidivist offenders, and no longer applies to multiple § 924(c) convictions obtained in a single prosecution. According to Jordan, the First Step Act should apply to him on appeal, which would mean that his second § 924(c) conviction would be subject only to a five-year sentence, not to the 25-year sentence he is serving.

This question is governed by the text of the First Step Act, which provides that § 403(a)'s "amendments" to § 924(c) "shall apply to any offense that was committed before the date of enactment of this Act, *if a sentence for the offense has not been imposed as of such date of enactment.*" § 403(b), 132 Stat. at 5222 (emphasis added).[3] Jordan was sentenced by the district court in October of 2017, more than a year before the "date of enactment" of the First Step Act in December of 2018. So the question is whether Jordan's sentence was "imposed" for purposes of § 403(b) when the district court entered his sentence – in which case the First Step Act would not apply to him – or whether, as Jordan argues, it will not be "imposed" until it becomes final after direct appeal – in which case he should get the benefit of the First Step Act on this appeal. Like the government, we

---

[3] Section 403(b) reads in full: "Applicability to Pending Cases—This section, and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment."

think Jordan's sentence was "imposed" in the district court, rendering § 403(a) inapplicable to his case.

Circuit court case law uniformly supports that reading. Two other circuits have considered precisely this question, and both have concluded that a sentence is "imposed" under § 403(b) when it is entered by a district court, so that § 403(a) does not apply to cases pending on appeal on the date of enactment. *See United States v. Richardson*, Nos. 17-2157/2183, --- F.3d ----, 2020 WL 413491, at *9–15 (6th Cir. Jan. 27, 2020); *United States v. Hodge*, 948 F.3d 160, 162–64 (3d Cir. 2020).[4] Two additional circuits have considered identical retroactivity language in a different section in the First Step Act, and likewise held that a sentence is "'imposed' in the district court, regardless of later appeals." *United States v. Pierson*, 925 F.3d 913, 927 (7th Cir. 2019); *see also Young v. United States*, 943 F.3d 460, 462 (D.C. Cir. 2019).[5] We agree.

As those courts have explained, in common usage in federal sentencing law, a sentence is "imposed" when the district court announces it, not when appeals are exhausted.

---

[4] The Eleventh Circuit reached the same conclusion in an unpublished decision. *See United States v. Garcia*, No. 17-13992, 2019 WL 7503482, at *1 (11th Cir. July 9, 2019).

[5] Those cases involve § 401 of the First Step Act, which provides that its sentence reductions "shall apply to any offense that was committed before the date of enactment of this Act, if a sentence has not been imposed as of such date of enactment." § 401(c), 132 Stat. at 5221. Before ruling directly on the provision before us now, § 403(b), both the Third and Sixth Circuits also had concluded that § 401 likewise does not apply to pre-enactment sentences pending on appeal when the First Step Act became law. *See United States v. Aviles*, 938 F.3d 503, 510 (3rd Cir. 2019); *United States v. Wiseman*, 932 F.3d 411, 417 (6th Cir. 2019).

*See Richardson*, 2020 WL 413491, at *11 (citing examples); *Pierson*, 925 F.3d at 927–28 (citing examples); *see also, e.g.*, 18 U.S.C. § 3553(a) (listing "factors to be considered" by a district court "in *imposing* a sentence" (emphasis added)); Fed. R. Crim P. 32(a)(2) ("After *imposing* sentence in a case which has gone to trial on a plea of not guilty, the court shall advise the defendant of the defendant's right to appeal . . . ." (emphasis added)). That consistent usage reflects the common understanding that "[i]mposing sentences is the business of the district courts, while courts of appeals are tasked with reviewing them." *Aviles*, 938 F.3d at 510 (internal quotation marks omitted).[6] It also is consistent, as the government points out, with the fact that defendants ordinarily begin serving their sentences as soon as they are handed down by a district court, regardless of any appeal. *See* 18 U.S.C. § 3143(b).

Jordan's contrary reading, on the other hand – that a sentence is not "imposed" until it becomes final after appeal – has no support in the text of § 403(b). Section 403(b) requires, for application of the Act, that a sentence be "imposed" after its enactment, not that it be "finally imposed." § 403(b), 132 Stat. at 5222. And the absence of a textual finality requirement is underscored by the fact that Congress *did* use finality as a marker in

---

[6] Given the time elapsed between Jordan's district court sentencing in October of 2017 and the enactment of the First Step Act in December of 2018, we need not address today the precise moment at which a district court sentence is "imposed" for purposes of § 403(b) – whether imposition comes when a sentence is announced or when judgment is entered. *Cf. Richardson*, 2020 WL 413491, at *12. Nor, of course, do we have any occasion to address how § 403(b) might apply to a resentencing, rather than an initial sentencing like Jordan's. *Cf. Hodge*, 948 F.3d at 162 (construing § 403(b) in context of a resentencing).

22

the immediately preceding section, § 403(a), amending § 924(c) so that the 25-year mandatory minimum would apply only to offenses that occur after a prior § 924(c) conviction "become[s] *final*." § 403(a), 132 Stat. at 5221 (emphasis added); *see Hodge*, 948 F.3d at 163. Where Congress wanted to make finality a benchmark, in other words, it did so, and we have no warrant for treating the omission of finality language in § 403(b) as an oversight. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration and internal quotation marks omitted)).

Jordan points us to the Sixth Circuit's 1997 decision in *United States v. Clark*, in which the court, construing a different sentencing statute and retroactivity provision, held that a sentence is not "imposed" until after a case is decided on appeal. *See* 110 F.3d 15, 17 (6th Cir. 1997), *superseded by regulation on other grounds*, U.S.S.G. § 1B1.10(b)(2)(A). That case does indeed lend support to Jordan's position here. But we can find no other circuit court decision applying that definition of "imposed" even under the statute at issue in *Clark*, let alone applying it in any other context. *See Pierson*, 925 F.3d at 928. And the Sixth Circuit itself, in joining the consensus that a sentence is "imposed" for purposes of the First Step Act's retroactivity provisions when it is handed down by the district court, declined to apply *Clark* to this different statute, cautioning against giving that decision "broad applicability." *Richardson*, 2020 WL 413491, at \*14; *see also Wiseman*, 932 F.3d at 417 (holding that sentence is "imposed" under § 401(c) of First Step Act without applying *Clark*).

23

Jordan's final argument focuses on the title of § 403 of the First Step Act: "Clarification of Section 924(c) of Title 18, United States Code." According to Jordan, because § 403 is intended only to clarify what always was the proper interpretation of § 924(c), it should apply to cases on direct review. *See Richardson*, 2020 WL 413491, at *9 (describing import of the distinction between a new law and a "clarification" for retroactivity analysis). Moreover, Jordan concludes, this feature is enough to distinguish at least some of the cases deciding when a sentence is "imposed" under the First Step Act because they arise under § 401, which does not refer to "clarification" in its title.

Jordan's argument puts more weight on the word "clarification" than it will bear. Section 403(a) does not "clarify" something that once was ambiguous; it *changes* § 924(c), providing by terms that it is "amend[ing]" that section's text. *See* § 403(a), 132 Stat. at 5221–22; *Richardson*, 2020 WL 413491, at *11 ("That Congress altered the statutory language" suggests that "the amendment changed the law rather than clarified what the law always meant."). Until the First Step Act, § 924(c) "unambiguous[ly]" imposed a 25-year minimum sentence on a "second" conviction obtained in the same proceeding as the first, *see Deal*, 508 U.S. at 132; now it does not. That is a change in meaning, not an elaboration of existing law. *Richardson*, 2020 WL 413491, at *10. And in any event, of course, "the title of a statute . . . cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528–29 (1947). Section 403(b) expressly addresses the circumstances under which § 403(a) will apply to pre-enactment cases, and by its plain terms, it excludes cases – like Jordan's – in which a defendant is sentenced before the Act's effective date.

24

Any reduction in criminal penalties will pose "difficult line-drawing" questions when it comes to retroactivity. *See Pierson*, 925 F.3d at 927. Here, Congress decided to extend the more lenient terms of § 403(a) of the First Step Act to some but not all pre-Act offenders, with "the date of sentencing in the district court" drawing the line between those who are covered and those who are not. *Id.* As a result, Jordan may not benefit under the Act.

### III.

For the reasons given above, the judgment of the district court is affirmed.

*AFFIRMED*